

U.S. Department of Justice

United States Attorney
Eastern District of New York

JPM/DEL/MWG/ADR  　　　　　　　　　　　　　271 Cadman Plaza East
F. #2020R00637  　　　　　　　　　　　　　　Brooklyn, New York 11201

April 4, 2023

By ECF

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

　　　　　　　Re:　　United States v. John Ragano
　　　　　　　　　　　Criminal Docket No. 21-466 (S-1) (HG)

Dear Judge Gonzalez:

　　　　　　The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for April 11, 2023, at 11 a.m.  On November 28, 2022, the defendant John Ragano pleaded guilty to Counts Six and Ten of the above-captioned superseding indictment (the "Indictment"), which charged violations of Title 18, United States Code, Section 1028(f) (conspiracy to commit fraud in connection with a means of identification) and Title 18, United States Code, Section 894(a)(1) (extortionate collection of credit conspiracy), respectively.  For the reasons below, the government respectfully requests that the Court impose a sentence at the high end of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 70 to 87 months' imprisonment.

I.　　　Background

　　　　A.　　The Offense Conduct

　　　　　　This case arose from an investigation initiated in July 2020 by the Federal Bureau of Investigation ("FBI") and other law enforcement agencies into the extortion of a senior official of a Queens, New York labor union by members of the Colombo crime family.  Presentence Investigation Report ("PSR") ¶ 7.  During the course of the investigation, law enforcement officers uncovered a number of additional illegal schemes involving the defendant, who is a soldier in the Bonanno crime family.  Those included: (1) a scheme to sell and profit from fraudulent certifications of Occupational Safety and Health Administration ("OSHA") trainings; (2) a loansharking scheme; and (3) a marijuana trafficking scheme.

1. <u>The OSHA Scheme</u>

The defendant engaged in an extensive and lucrative scheme with several of his co-defendants to obtain fraudulent workplace safety certifications from OSHA and local regulators in New York State and New York City. As background, OSHA operates a voluntary workplace safety training program, which provides courses about hazards a construction worker may encounter on a job site. Upon successfully completing either a 10-hour training program or a 30-hour training program, an attendee is provided a completion card. These cards are commonly referred to as the "OSHA-10" and "OSHA-30" cards. PSR ¶¶ 30-31.

For several years, the defendant operated two training "schools," one in Franklin Square, New York and one in Ozone Park, New York, that claimed to provide workplace (and other safety) trainings, but instead operated as mills issuing fraudulent safety cards to hundreds of individuals who did not take part in the training required for the issuance of these certifications. PSR ¶¶ 35-40. The defendant charged as much as $500 per card, and enrolled dozens of applicants per course. <u>Id.</u> The scheme thus generated tens of thousands of dollars monthly. <u>Id.</u> ¶ 29.

In October 2020, an undercover law enforcement officer visited the Ozone Park school and obtained from co-defendant Domenick Ricciardo a blank test form for the OSHA-30 card, an answer sheet for that test, and a sign-in sheet for the class roster. Several weeks later, the undercover officer returned to pick up his OSHA-30 card, paying a total of $500. Ricciardo also subsequently provided the undercover officer a New York City site-safety training ("SST") card in exchange for $450, despite the undercover officer again not having attended any required training classes or completed any class requirements. PSR ¶¶ 41-46.

The investigation further illustrated the defendant's brazenness in his operation. On April 19, 2021, at his OSHA school in Franklin Square, the defendant was recorded discussing the OSHA scheme during a conversation about whether a woman he was associated with could report anything about his activities to law enforcement. PSR ¶ 47. The conversation occurred one day after the defendant slashed the tires of the woman's automobile:

> "I don't know what you think that I'm scared of .... There's nothing they can do to me. The only thing she could do is call the cops and tell them I'm doing OSHA . . . If she calls the cops and tells them that? I'll just tell them, hey, okay, put me in jail, what's the problem? No, non-violent, Pal, what are they gonna give me, three years? I'll do that with my cock on the bars. So, she doesn't get that. This is one job that I ever been in in my life, if you left me or not, I ain't afraid to go to jail for this, it's non-violent, I'll get 35 months, 40 months, *claps hands*, and I'll be home, at 65. Not a problem, so, you think I'm here for nothing cause of all this time thinking I'm going to jail? I'd have been gone already. Mother fuckers, dumb fuck, real stupid bitch, the things that I've done for this girl."

<u>Id.</u>

### 2. The Loansharking Scheme

The defendant also engaged in a loansharking scheme with several of his Colombo crime family co-defendants. In October 2020, according to banking records and wire interceptions, defendant Michael Uvino loaned $100,000 to an individual referred to in the Indictment as John Doe #2. John Doe #2 was required to make payments on a weekly basis to Uvino and defendant Vincent Ricciardo, which equated to approximately 1.5 percent weekly interest (or "vig") on the $100,000 loan. PSR ¶¶ 52-55. Soon thereafter, in February 2021, the defendant became involved in this loansharking scheme by loaning John Doe #2 an additional $150,000 requiring weekly payments, which equated to approximately 1.5 percent weekly interest and did not reduce the principal. PSR ¶ 56. In July 2021, when John Doe #2 was behind in payments, defendant Thomas Costa was recorded stating that Vincent Ricciardo had told Costa to give John Doe #2 a "beating." PSR ¶ 60.

### 3. The Drug-Trafficking Scheme

Lastly, the defendant conspired with several co-defendants to distribute marijuana in New York and Florida. While the defendant did not plead guilty to the drug trafficking charges, the scheme nonetheless constitutes relevant conduct that the Court may consider at sentencing. Based on consensual recordings, text messages sent over encrypted messaging applications, and witness testimony, the drug-trafficking scheme involved transporting large shipments of marijuana by vehicle to Florida. The scheme included a plan by the defendant (and co-defendants Vincent Martino, John Glover, Thomas Costa and Vincent Ricciardo) to purchase samples of marijuana to determine which sample to later obtain in larger quantities. PSR ¶¶ 62-69.

In June 2021, the investigation found that the defendant had picked up one-pound samples of two different types of marijuana from Costa and Martino and brought them back to the Ozone Park OSHA school. PSR ¶ 68. The defendant and Glover then began contacting potential buyers in New York by phone to secure commitments to purchase larger quantities of marijuana. Costa and Martino then received money from marijuana sales at Martino's business located in Suffolk County, New York. Id.

### 4. The Defendant's Commitment to Violence

In multiple recorded conversations, the defendant has demonstrated a willingness to commit violence. PSR ¶ 70. For example, as described above, on April 19, 2021, in a consensually recorded conversation, the defendant discussed slashing the tires on the prior day of three different vehicles as retaliation in a business dispute with a woman he was associated with. PSR ¶ 71. He also threw a garbage can at the woman's vehicle. He stated, "If I gotta go back to jail, I'll go back to jail." Id. Later in the conversation, in reference to the associate and her property, he stated, "I'm going to burn everything, and there ain't no camera." Law enforcement officers later confirmed that the parked cars the defendant had described had flat tires. Id.

In another example, on June 2, 2021, in a consensually recorded conversation, the defendant stated that he "beat a guy with a baseball bat . . . I beat the guy with a full bottle of fucking Heineken, not Heineken, Colt .45, I cracked him like seven times on top of his head." PSR ¶ 69. Earlier that same day, in a consensually recorded conversation discussing the marijuana

3

conspiracy described above, the defendant stated: "What am I a fucking jerk off? I'm in the street all day hustling my ass off. I'm the only fucking gangster around here that'll go to jail, stop jerking me off man, you gave me the shit for 600, I can go sell it for 1,000, I'll be in the street a gangster, like a n****, you're giving it to me for the same price the n**** are paying, you ain't doing nothing for me!" Id.

  B. <u>The Defendant's Criminal History</u>

The defendant has a prior conviction for kidnapping in the second degree for which he was sentenced to ten years' imprisonment in 1999. PSR ¶ 107. The facts underlying the offense were particularly disturbing. The defendant held up an accounting firm in Ozone Park, Queens, ordering the firm's owners at gunpoint to turn over money. Id. The defendant placed a gun to one victim's head, told him that he knew where he lived, and demanded that he reveal the alarm code for the security system at his home. The defendant threatened to kill the victim if the victim moved. The defendant and an accomplice tied up the two victims in the back room of the accounting firm offices. Sometime thereafter, the police arrived and interrupted the robbery. The defendant and his accomplice ultimately surrendered, and the hostages were freed. The firearm used by the defendant was recovered from the scene. Id.

The defendant also was convicted in 2002, while serving a lengthy sentence in state custody, in the Eastern District of New York, of federal conspiracy and theft of government funds charges. He received a sentence of 30 months' imprisonment to be followed by three years' supervised release and was ordered to pay $68,923 in restitution. PSR ¶ 108. In light of his long state sentence, the defendant did not begin his period of federal supervised release until 2010, and the term did not expire until February 2013.

In or about January 2014, the defendant was again indicted in the Eastern District of New York, where he was charged with racketeering conspiracy and alleged to be an inducted member and solider of the Bonanno crime family (see No. 14-CR-26-ARR). PSR ¶ 109. The conduct in that case involved a loan that a Bonanno family associate had extended to an individual (the "car wash employee") affiliated with the Gambino organized crime family. The loan was extended to the car wash employee at an interest rate that was at least twice the enforceable rate under New York state law. In a consensually recorded meeting during that investigation, Ragano and Bonanno family member Vincent Asaro discussed assaulting a Bonanno associate and intimidating him into paying them and their coconspirators money collected on the car wash employee loan. Ragano asked Vincent Asaro soon after arriving at the April 26, 2013 meeting, "when do we stab this guy [the associate] in the neck? That's what I want to know," to which Asaro responded, "[s]tab him today. . . . Today! Today!"

In March 2015, the defendant was sentenced to 51 months' imprisonment and three years' supervised release. He was released in or about October 2017 and finished his three-year term of supervised release in October 2020. Id. While on supervised release, the defendant devised and executed the lucrative fraudulent OSHA certification scheme described above. Immediately after his supervision was completed, he became involved in the loansharking and drug-trafficking schemes also described above.

    At the time of his arrest in the instant case, the defendant repeatedly refused arresting agents' requests to depart his residence, to put on clothing and to wear a face mask. PSR ¶ 72.

  C. <u>Guidelines Calculation</u>

    The government agrees with the United States Probation Department's ("Probation's") calculation of the defendant's offense level in the PSR as set forth below:

<u>Count Six: Conspiracy to Commit Fraud in Connection with Means of Identification</u>

| | | |
|---|---|---:|
| | Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Plus: | Offense Involved More than $250,000 (§ 2B1.1(b)(1)(G)) | +12 |
| Plus: | Organizer or Leader (§ 3B1.1(a)) | +4 |
| | Total: | <u>22</u> |

<u>Count Ten: Extortionate Collection of Credit Conspiracy</u>

| | |
|---|---:|
| Base Offense Level (§ 2E2.1(a)) | <u>20</u> |

<u>Multiple Count Analysis (§ 3D1.4)</u>

| | |
|---|---:|
| Highest Adjusted Offense Level | <u>22</u> |
|  Units: | |
|   Count Six | 1 |
|   Count Ten | 1 |
|   Total Units | 2 |
| Levels Added (§ 3D1.4) | +2 |
| Less: Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Total: | <u>21</u>[1] |

---

[1]  The plea agreement entered into by the defendant provided for an additional two-level reduction that was conditioned on a global resolution of the case (<u>see</u> U.S.S.G. § 5K2.0). As the necessary conditions for the reduction did not occur, the reduction does not apply.

5

PSR ¶¶ 82-103. Because the defendant is in criminal history Category V, the resulting Guidelines range calculated in the PSR is 70 to 87 months' imprisonment. Id. ¶ 169.

The defendant objects to the inclusion of the enhancement under USSG § 3B1.1(a) for being an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" in connection with the OSHA scheme. As noted in the PSR, the defendant directed a scheme that included himself and at least four other individuals, Domenick Ricciardo, Vincent Ricciardo, John Glover and an individual referred to in the indictment as Co-Conspirator #1. The defendant controlled the scheme and was aware of its nature and scope, and participated in planning and organizing it. Moreover, as the operator of the two OSHA schools described above, the defendant had the largest entitlement to the scheme's profits. See § 3B1.1(a) Note 4 ("Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.").

The defendant argues that, because Co-Conspirator #1 was cooperating with the government, he can not be counted in the number of participants. This is incorrect—the defendant and Co-Conspirator #1 were conducting the OSHA fraud scheme for at least one year before Co-Conspirator #1 began working with law enforcement officers. Further, the defendant offers no legal support for this conclusion and indeed no such exception can be found anywhere in USSG § 3B1.1(a) or its commentary. See § 3B1.1(a) Note 1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant."). Co-Conspirator #1 was not an undercover law enforcement officer but instead is someone who was criminally responsible for the offense, even if not charged in the Indictment. See United States v. Cuti, No. 08-CR-972, 2011 WL 3585988, at *8 (S.D.N.Y. July 29, 2011) (unindicted co-conspirator who testified against defendant at trial was "participant" in criminal activity for § 3B1.1(a) purposes).

In any event, the enhancement is still appropriate because "there were a host of named and unnamed participants in the criminal activity," id. at *9, and the scheme was clearly "otherwise extensive." The scheme spanned well over a year or more, involved additional individuals who referred customers to the defendant, involved additional unknowing employees of the two OSHA schools, and resulted in hundreds of complicit individuals obtaining OSHA certifications that were never earned (presenting an incalculable risk of danger in workplaces throughout the community). See § 3B1.1(a) Note 3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."); see also Cuti, 2011 WL 3585988, at *9.

II.   The Defendant's PSR Objections

The defendant has filed certain additional objections to the PSR, which the government addresses below:

- Paragraph 25: The defendant objects to a statement in the PSR that co-defendant John Glover "worked for" him. The defendant does not assert that the statement is inaccurate but merely that it is "overly simplistic" and that, in fact, the defendant and Glover "complemented each other." These concepts are not inconsistent. In any event, Glover clearly worked for the defendant. Glover was certified by OSHA to conduct the safety trainings described above; the defendant was not. The defendant therefore employed Glover to be an OSHA-certified trainer at his training schools. Because the PSR's description that Glover worked for the defendant is accurate, Paragraph 25 of the PSR should remain unchanged.

- Paragraph 28: The defendant objects to the inclusion of co-defendant Vincent Ricciardo in the PSR's description of the OSHA scheme. The defendant does not assert that Vincent Ricciardo was uninvolved in the scheme, only that the defendant's conduct in the scheme did not include a "relationship" with Ricciardo. In fact, Vincent Ricciardo was involved in the OSHA scheme—among other things, he referred individuals (including other co-defendants) to the defendant to buy fraudulent certifications from the defendant's OSHA schools. Nothing about the PSR's description of the scheme or Ricciardo's involvement in it is inaccurate, and therefore Paragraph 28 of the PSR should remain unchanged.

- Paragraphs 113 & 189: The defendant objects to the inclusion in the PSR of information relating to a violent incident in which he slashed the tires of an associate's cars. The defendant does not appear to object to the accuracy of the information, and the incident is relevant conduct during the charged schemes that the Court may properly consider at sentencing. In particular, as described above, it helps demonstrate the defendant's consistent willingness to resort to violence. Paragraphs 113 and 189 of the PSR should therefore remain unchanged.

III.   Sentencing Analysis

The government respectfully submits that a sentence at the high end of the Guidelines range of 70 to 87 months is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. The need for a significant sentence is underscored by the sentencing factors articulated in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense; the history and characteristics of the defendant; and the need to protect the public from further crimes of the defendant.

The nature and circumstances of the defendant's offenses were very serious. The defendant was and remains a member of the Bonanno organized crime family who devised and executed multiple illicit schemes with other members of organized crime. In particular, the defendant engaged in a lengthy and sophisticated scheme to sell fraudulent safety certifications to individuals who did not in fact complete required safety trainings, at great profit to himself and at great risk to the safety of the community. The defendant further engaged in a ruthless loansharking

scheme that relied upon threats of physical violence. The criminal activities here—loansharking, drug trafficking and fraud—while not included in the RICO charge in this case, were nevertheless consistent with the regular criminal acts of La Cosa Nostra. In addition, the government's investigation showed that the defendant continued to have contact with Jerome Asaro, the captain in the Bonanno crime family to whom the defendant reported.

The danger posed by this conduct was enhanced in this case by the defendant's repeated demonstrations of his willingness to engage in violence, including bragging about having beaten someone with a baseball bat and a beer bottle, and slashing tires and otherwise destroying property, among other things. It was further enhanced by the defendant's history of violence, which lends important context to his later threats, and which includes a vicious gunpoint robbery in which he tied up his victims as hostages and repeatedly threatened to kill them.

The defendant's lengthy criminal history also shows a proven inability and unwillingness to move on from a criminal lifestyle and to abide by judicial orders. As described above, the defendant has been arrested and convicted of multiple crimes throughout his life. His criminal history includes prior serious offenses stemming from his affiliation with organized crime, just like the instant offenses. Moreover, the defendant began the instant conduct while still on supervised release from his most recent conviction before Judge Ross. The defendant has demonstrated time and again his commitment to crime and his disregard for the justice system. This brazenness was made absolutely clear in his April 19, 2021 statements described above regarding the OSHA scheme: "There's nothing they can do to me . . . what are they gonna give me, three years? . . . I ain't afraid to go to jail for this."

A sentence at the high end of the applicable Guidelines range would adequately address the seriousness of the defendant's crimes, account for the defendant's history of criminality and failure to adhere to the law, and protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a).

III.     Conclusion

        For these reasons, the government respectfully requests that the Court impose a sentence at the high end of the applicable Guidelines range of 70 to 87 months' imprisonment.

                                                                Respectfully submitted,

                                                                BREON PEACE
                                                                United States Attorney

                                By:     /s/_____

                                                     James P. McDonald
                                                   Devon Lash
                                                   Michael W. Gibaldi
                                                   Andrew D. Reich
                                                   Assistant United States Attorneys
                                                   (718) 254-7000

cc:     Joel M. Stein, Esq.
         United States Probation Officer Frank T. Nikolaidis